IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAMANTHA RENEE MEACHAM | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW M. SAUL,[1] | : | |
| Commissioner of Social Security | : | |
| Administration | : | NO.  18-5245 |

## MEMORANDUM OF DECISION

THOMAS J. RUETER
United States Magistrate Judge                                    September 13, 2019

      Plaintiff, Samantha Renee Meacham, filed this action pursuant to 42 U.S.C. §

405(g), seeking judicial review of the final decision of the Commissioner of the Social Security

Administration ("Commissioner") denying her claim for disability insurance benefits ("DIB")

under Title II of the Social Security Act ("Act") and supplemental security income ("SSI") under

Title XVI of the Act.

      Plaintiff filed a Brief and Statement of Issues in Support of Request for Review

(Doc. 14) ("Pl.'s Br.") and defendant filed a Response to Plaintiff's Request for Review ("Def.'s

Br.").  For the reasons set forth below, the court recommends that plaintiff's Request for Review

be **DENIED**.

## I.        FACTUAL AND PROCEDURAL HISTORY

      Plaintiff filed applications for DIB and SSI on July 27, 2015, alleging disability

beginning August 1, 2014.  (R. 170-80.)  Plaintiff's claims were denied initially and she filed a

---

[1]        On June 4, 2019, Andrew M. Saul became the Commissioner of the Social Security
Administration.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul
should be substituted as the defendant in this case.

timely request for a hearing.  (R. 68-97, 100-11.)  A hearing was held on October 31, 2017,

before Administrative Law Judge ("ALJ") Susannah Merritt.  (R. 32-67.)  Plaintiff, represented

by counsel, appeared and testified.  Christine Carrozza-Slusarski, a vocational expert ("VE"),

also appeared and testified.  At the administrative hearing, plaintiff's counsel requested that the

alleged onset date be amended to October 25, 2014.  (R. 36.)  In a decision dated December 28,

2017, the ALJ found that plaintiff was not disabled under the Act.  (R. 12-31.)  The ALJ made

the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since October 25, 2014, the amended alleged onset date.  (20 CFR 404.1571 *et seq*., and 416.971 *et seq.*).

3. The claimant has the following severe impairments: multiple sclerosis (MS), headaches, bipolar disorder, anxiety disorder, and myalgia in the right leg.  (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1.  (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that in an eight hour workday, she can sit for six hours, stand for four hours, and walk for four hours.  In addition, she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but can never climb ladders, ropes, or scaffolds. She can tolerate occasional exposure to unprotected heights, moving mechanical parts, and extreme cold.  She is further limited to the performance of simple, routine, and repetitive tasks that are not at a production rate pace, i.e. no assembly line work.  Finally, the work must involve only simple work-related decisions with few changes in a routine work setting and no more than occasional interaction with the public, co-workers, and supervisors.

6. The claimant is unable to perform any of his past relevant work.  (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 29, 1980 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 25, 2014, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(R. 14-25.)

Plaintiff filed a request for review of the decision of the ALJ that was denied and the ALJ's decision became the final decision of the Commissioner. (R. 1-8, 163-69.) Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## II.     STANDARD OF REVIEW

The role of this court on judicial review is to determine whether there is substantial evidence in the record to support the Commissioner's decision. Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (citing 42 U.S.C. § 405(g)), cert. denied, 571 U.S. 1204 (2014); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence is more than a mere scintilla of

evidence, but may be less than a preponderance of the evidence. Jesurum v. Sec'y of U.S. Dep't of Health and Human Serv., 48 F.3d 114, 117 (3d Cir. 1995). This court may not weigh evidence or substitute its conclusions for those of the fact-finder. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002) (citing Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)). As the Third Circuit has stated, "so long as an agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse . . . those findings." Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1191 (3d Cir. 1986).

To be eligible for benefits, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Specifically, the impairments must be such that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Under the Act, the claimant has the burden of proving the existence of a disability and must furnish medical evidence indicating the severity of the impairment. 42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(H)(i).

The Social Security Administration employs a five-part procedure to determine whether an individual has met this burden. 20 C.F.R. §§ 404.1520, 416.920.[2] This process requires the Commissioner to consider, in sequence, whether a claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment which meets or equals the

---

[2]    For purposes of this opinion, the court will refer to the version of the relevant regulation in effect at the time of the ALJ's decision on December 28, 2017.

requirements of a listed impairment; (4) can perform past relevant work; and (5) if not, whether the claimant is able to perform other work, in view of his age, education, and work experience. See id. The claimant bears the burden of establishing steps one through four of the five-step evaluation process, while the burden shifts to the Commissioner at step five to show that the claimant is capable of performing other jobs existing in large numbers in the national economy. Hess v. Comm'r of Soc. Sec., 931 F.3d 198, 201 (3d Cir. 2019).

## III. BACKGROUND

At the commencement of the October 31, 2017 administrative hearing, plaintiff's counsel requested that the alleged onset date be amended to October 25, 2014. (R. 36.) Counsel noted that plaintiff has a history of substance abuse in remission; the amended alleged onset date corresponds to the date of last drug use. Id.[3]

Plaintiff, who was thirty-seven years old at the time of the administrative hearing, testified that she lived in apartment with her fiancé and five-year-old daughter. (R. 36, 38.) Plaintiff drives and "rarely" takes public transportation, although she used public transportation to travel to the administrative hearing. (R. 39.) Plaintiff graduated from high school and completed approximately four semesters of schooling at Delaware County Community College. Id. She stopped attending school when she became pregnant with her daughter in 2011. (R. 40.)

Plaintiff last worked in 2015, when she was employed for one month as a part-time cashier at Chipotle. Id. Plaintiff explained that her employment was terminated because she "wasn't catching on to their computer system and it just wasn't working out." (R. 41.) Prior to this employment, plaintiff worked full-time at Santander Bank for eight years. Id. She

---

[3]     Plaintiff's counsel indicated that the request to amend the alleged onset date was made "[s]o there's no question about interference with the mental health issues." (R. 37.)

worked as head teller for two of the eight years.  Id.  In this role, plaintiff supervised one other employee.  Id.  With respect to the physical requirements of the teller job, plaintiff testified that she was permitted to perform the work while sitting or standing.  (R. 41.)  The heaviest item that she was required to lift was a box of coins.  (R. 42.)  Plaintiff's responsibilities also included accurately maintaining her cash drawer and interacting with customers.  (R. 43.)  In addition, the position included sales duties; tellers were to sell various bank products such as credit cards and bank accounts.  Id.  Plaintiff indicated that she stopped working as a bank teller when she began experiencing "brain fog," became frustrated, and felt that she could no longer perform the job.  (R. 46.)  Plaintiff was not terminated from this employment, but acknowledged that she "had started getting written up a lot at that point."  Id.  Prior to working as a bank teller, plaintiff worked from 2001 to 2005 as a part-time clerk in a video store.  (R. 43-44.)  In addition, plaintiff worked full-time from 2002 to 2005 in the customer service department of Sharper Image.  (R. 44-45.)

When asked to explain why she is unable to work, plaintiff stated that she experiences "really horrible pain" in her legs.  (R. 46.)  She noted that her legs "are always tender" and that she also experiences shooting pain, which sometimes is alleviated by laying down and sometimes is alleviated by standing.  Id.  Plaintiff also experiences back pain and brain fog.  Id.  Plaintiff takes Neurontin and Gabapentin daily for pain.  (R. 47.)  Plaintiff also takes Methadone.  Id.[4]  She acknowledged a history of substance abuse, but represented that she last used drugs or alcohol in October 2014.  Id.  Plaintiff also explained that she was incarcerated from October 2014 until January 2015, at which time she entered inpatient rehab.  Id.  She

---

[4]       Plaintiff testified that she also takes Baclofen, Zantac, Wellbutrin, and Latuda.  (R. 48.) She denied experiencing side effects from any of the medication.  Id.  In addition, plaintiff takes medication to treat the symptoms of MS.  (R. 57.)

resided in a halfway house until February 2015.  Id.  In addition, plaintiff participated in an intensive outpatient program for one year at NHS Parkside ("NHS") and regained custody of her daughter during that time.  (R. 47-48.)

With respect to her mental impairments, plaintiff stated that she had been taking Latuda to treat bipolar depression for one month.  (R. 48.)  She had taken Buspar for anxiety and Wellbutrin for depression for approximately one year.  Id.  This medication was prescribed by the psychiatrist at NHS, whom she met with on a monthly basis for three to four months.  (R. 49.)  Plaintiff indicated that she also met with a therapist on a weekly basis.  Id.  Before she commenced mental health treatment at NHS, plaintiff met monthly with a psychiatrist as part of her drug and alcohol treatment program.  Id.  This treatment began in October 2014.  Id.  Plaintiff explained that while her symptoms of anxiety and depression have improved "a little bit" since she began taking medication, she continues to feel depressed due to her limitations.  Id.  Plaintiff also receives treatment from a primary care physician; a neurologist treats plaintiff for MS.  (R. 50-51.)  Plaintiff met with these physicians three to four times per year.  (R. 51.)

With respect to her daily activities, plaintiff testified that each day she gets dressed and then drives to the methadone clinic for treatment.  (R. 52-53.)  She also attends therapy if it is scheduled.  (R. 53.)  Upon returning home, plaintiff rests, then drives to school to pick up her daughter.  Id.  After school, plaintiff helps her daughter with homework.  (R. 54.)  Plaintiff's fiancé typically cooks dinner and goes grocery shopping, although plaintiff cooks "every once in a while" and can go shopping "if [she has] to."  (R. 54-55.)  Plaintiff's fiancé does the family's laundry at a laundromat.  (R. 55.)  Plaintiff indicated that her fiancé performs the other household chores such as cleaning the bathroom and vacuuming, because it is difficult for her to complete such tasks.  (R. 56.)  In her free time during the day, plaintiff also reads, knits,

and meditates.  (R. 55.)  With her daughter, plaintiff colors, plays games on a tablet, watches movies, and goes to the park.  (R. 56.)

In response to questioning by her attorney, plaintiff explained that she has a need to rest during the day because she "gets really tired, really easily."  (R. 57.)  Due to fatigue, she can knit or read for no longer than thirty minutes.  Id.  When asked to describe the shooting pain she experiences in her thighs, plaintiff explained that the pain occurs "a couple times a day" and awakens her at night.  Id.  At times, plaintiff has difficulty getting out of bed in the morning due to pain and mental fatigue.  (R. 58.)  Plaintiff must rest if she has to walk more than two blocks. Id.  She estimated that she can stand for thirty minutes before she must move; she can sit only for "an hour or two."  (R. 58-59.)  Plaintiff also has difficulty climbing stairs.  (R. 59.)  She noted that she gets winded and has pain in her thighs when she climbs the flight of stairs at the methadone clinic.  Id.  She estimated that she can lift and carry items weighing up to ten pounds. Id.  Although leg pain occasionally awakens her at night, plaintiff does not otherwise experience sleep difficulty.  Id.  Cold weather exacerbates her leg pain.  (R. 60.)

The VE testified that plaintiff's past work as a teller, and as a head teller, was skilled, light work as performed.  (R. 61-62.)  In addition, the customer service position was skilled, sedentary work.  (R. 62.)  The ALJ asked the VE to consider a hypothetical individual of plaintiff's age, education, and work history, who is limited as follows:

> The individual is at a light exertional level with the modification of standing or walking for four hours out of the eight hour work day.  In addition, the individual can climb stairs and ramps occasionally; never climb ladders, ropes, or scaffolds. The individual can occasionally balance, stoop, kneel, crouch, crawl.  And the individual can work at unprotected heights occasionally; moving mechanical parts, occasionally; and occasionally be exposed to extreme cold.  In addition, the individual is limited to performing simple routine and repetitive tasks, but not at a production rate pace.  The individual can make simple work-related decisions, and can respond appropriately to supervisors, coworkers, and the public on an

occasional basis. The individual is limited to tolerating only occasional changes in the work setting.

(R. 62-63.) The VE testified that such hypothetical individual would not be able to perform plaintiff's past work, but could perform the following unskilled, light jobs: sorter (for which there are approximately 51,000 jobs in the national economy); marker or tagger for retail products (for which there are approximately 58,000 jobs in the national economy); and inspector for surgical instruments (for which there are approximately 51,000 jobs in the national economy). (R. 63.) The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), except as described based on her personal experience. (R. 63-64.)

The ALJ posed a second hypothetical question to the VE, in which the hypothetical individual had the same limitations as in the first hypothetical, but was limited to sedentary work. (R. 64.) The VE opined that such hypothetical individual could perform the following unskilled, sedentary jobs: clerical addresser/envelope addresser (for which there are approximately 35,000 jobs in the national economy); table worker/inspector of small products (for which there are approximately 51,000 jobs in the national economy); and stuffer (for which there are approximately 38,000 jobs in the national economy). Id. The VE again confirmed that such testimony was consistent with the DOT. Id. The ALJ then asked the VE whether the individual in the first hypothetical question would be able to perform work in the national economy if she were off-task ten percent of the work day on a regular basis. (R. 65.) The VE indicated that if an employee is "off-task up to 10% . . . that would be acceptable with many employers. Beyond that, it's generally not accepted, based on my experience." Id.[5]

---

[5] When again asked if her testimony was consistent with the DOT, the VE replied, "[y]es, it generally is and it's just, again, the stand/walk is based on my experience, and then the – additionally the off-task is really based on my experience as a vocational counselor of over 30 years viewing positions, talking to managers, placing individuals." (R. 65.)

In response to questioning by plaintiff's attorney, the VE testified that an individual who has "serious limitations" with "substantial loss in the ability to effectively function" in her ability to interact appropriately with supervisors, and to respond appropriately to usual work situations and to changes in a routine work setting, would be unable to maintain competitive employment. (R. 65-66.) In addition, the VE confirmed that no work would be available for an individual with three or more absences per month on a consistent basis. (R. 66.)

## IV. DISCUSSION

The ALJ found that the evidence of record supports a finding that plaintiff has severe impairments, but none of which meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14-15.) Ultimately, the ALJ concluded that plaintiff retains the residual functional capacity ("RFC") to perform light work as detailed in her decision. See R. 17. Plaintiff presently contends that substantial evidence does not support the ALJ's decision. Specifically, plaintiff argues that the ALJ improperly evaluated the medical evidence, specifically the opinions of Adam Rom, M.D., a treating physician, and Erin Volpe, Ph.D., a State agency psychological consultant. (Pl.'s Br. at 4-20.) Defendant counters that the ALJ complied with Social Security regulations and relevant case law in her evaluation of the opinion evidence. (Def.'s Br. at 4-11.)

Pursuant to the Commissioner's regulations, RFC refers to the most a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC assessment must be based upon all relevant evidence, including medical records, medical source opinions, and a claimant's description of her own symptoms. The final responsibility for determining a claimant's RFC is reserved exclusively for the Commissioner, who will not give any special

significance to the source of another opinion on this issue. 20 C.F.R. §§ 404.1527(d), 416.927(d).[6]

In reaching the conclusion that plaintiff retains the RFC to perform a limited range of light work, the ALJ offered a comprehensive assessment of the evidence of record. See R. 17-24. First, the ALJ considered plaintiff's testimony at the administrative hearing and summarized the medical record evidence in detail. (R. 17-21.) In addition, the ALJ analyzed plaintiff's claims regarding the intensity, persistence and limiting effects of her symptoms in light of the record evidence. (R. 21-23.) The ALJ also considered and analyzed the opinion evidence. (R. 23-24.) Ultimately, the ALJ attributed "partial weight" to the opinions of Drs. Volpe and Rom, and attributed "great weight" to the opinions of Pramod Digamber, M.D., an internal medicine consultative examiner, and Erin Urbanowicz, Psy.D., a State agency reviewer. See R. 23.[7]

---

[6]     The court notes that 20 C.F.R. §§ 404.1527 and 416.927, rather than 20 C.F.R. §§ 404.1520c and 416.920c, apply because plaintiff's claims were filed before March 27, 2017.

[7]     On September 22, 2015, Dr. Digamber conducted an internal medicine examination of plaintiff, documenting generally normal clinical findings. See R. 388-91. Dr. Digamber also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) in which he opined that plaintiff was capable of medium work. See R. 392-97. In addition, Dr. Urbanowicz's opinion appears in the Disability Determination Explanation, documenting the denial of plaintiff's claims at the initial level. See R. 68-95. Therein, Dr. Urbanowicz reviewed the medical evidence of record, including the report of the consulting examiner, Dr. Volpe, who conducted a psychiatric evaluation of plaintiff. See R. 70. Dr. Urbanowicz considered plaintiff's affective disorders, anxiety-related disorders, personality disorders, and substance addiction disorders, and their effect on plaintiff's functional abilities. See R. 77-79. Dr. Urbanowicz concluded that plaintiff is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairments. (R. 79.) She pointed out that she had considered Dr. Volpe's report, but reasoned that Dr. Volpe's opinion was inconsistent with the evidence in the file. Dr. Urbanowicz stated, "[t]he examining source statements in the report concerning the claimant's abilities in the areas of making occupational adjustments, making performance adjustments and making personal and social adjustments are not consistent with all of the medical and non-medical evidence in the claims folder." Id. Dr. Urbanowicz cited as a basis for her findings that the consulting examiner appears to have "relied heavily on the subjective report of symptoms and limitations provided by the claimant.

Plaintiff avers that the ALJ erred in attributing only "partial weight" to the September 21, 2015, opinion of Dr. Volpe pertaining to plaintiff's mental impairments.  See Pl.'s Br. at 6-20.  Plaintiff also takes issue with the ALJ's assessment of Dr. Rom's March 11, 2016 opinions pertaining to plaintiff's mental and physical limitations.  See Pl.'s Br. at 5-6, 7-20. According to plaintiff, these opinions support her claims for benefits and establish far greater limitations than found by the ALJ, and the ALJ erred in failing to attribute greater weight to the opinions.  However, plaintiff's argument does not find support in the Commissioner's regulations, Third Circuit case law, nor the record in this case.

Generally, the Commissioner's regulations dictate that an ALJ must give medical opinions the weight she deems appropriate based on factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the record as a whole.  See 20 C.F.R. §§ 404.1527, 416.927.  With respect to treating physicians specifically, the regulations provide that an ALJ shall give a treating physician's opinion controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and it is not "inconsistent with the other substantial evidence" in the record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The Third Circuit has noted that an ALJ shall "accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (internal citations omitted).  The court subsequently explained, however, that "Morales v. Apfel requires that 'the ALJ accord treating physicians' reports great

---

However, the totality of evidence does not support the claimant's subjective complaints."  Id.  In addition, Dr. Urbanowicz further noted that Dr. Volpe's opinion "contrasts sharply with other evidence in the record, which renders it less persuasive."  Id.

weight,' but there is no requirement to accept those opinions if they are not supported by sufficient evidence in the record." Fullen v. Comm'r of Soc. Sec., 705 F. App'x 121, 125 (3d Cir. 2017) (not precedential).[8]

The Commissioner's regulations further direct that the ALJ must consider the supportability of an opinion in deciding the weight to give that opinion. See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). The Third Circuit recently reiterated the well-established standards for weighing opinion evidence. The court stated:

> An ALJ may "weigh the [conflicting] medical evidence and draw [her] own inferences." Brown v. Astrue, 649 F.3d 193, 196-97 (3d Cir. 2011) (quoting Kertesz v. Crescent Hills Coal Co., 788 F.2d 158, 163 (3d Cir. 1986)). Additionally, an ALJ may reject the opinion of a treating physician when it is unsupported and inconsistent with the other evidence in the record. See Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (quoting 20 C.F.R. § 404.1527(d)(2)).

Brunson v. Comm'r of Soc. Sec., 704 F. App'x 56, 59 (3d Cir. 2017) (not precedential). See also Plummer, 186 F.3d at 429 (An ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). Furthermore, in assessing the medical evidence, "[a]n ALJ may accept some portions of a medical source's opinion while rejecting other opinions from the same source." Connors v.

---

[8] If the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason. Morales, 225 F.3d at 317 (citing Plummer, 186 F.3d at 429). That is, a treating source's opinion may be rejected "on the basis of contradictory medical evidence," Plummer, 186 F.3d at 429, or if it is unsupported by sufficient clinical data, Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985). An ALJ may not reject a treating physician's opinion based upon his own credibility judgments, speculation, or lay opinion. Morales, 225 F.3d at 317.

Berryhill, 2017 WL 4400758, at *5 (E.D. Pa. Sept. 29, 2017). In the present case, the ALJ's analysis was congruent with these standards.

Here, the opinions of Drs. Volpe and Rom describe more severe functional limitations than ultimately determined by the ALJ in the RFC assessment. See R. 377-86, 402-06.[9] However, the ALJ determined that these opinions were entitled to "partial weight" because they were not supported by the evidence of record. Prior to discussing the opinion evidence, the

---

[9]    On September 21, 2015, Dr. Volpe conducted a psychiatric evaluation. (R. 378-86.) In her opinion, Dr. Volpe recounted plaintiff's mental health history as described by plaintiff and conducted a mental status examination, finding plaintiff to be cooperative and to demonstrate an adequate manner of relating. (R. 381.) In additional Dr. Volpe assessed plaintiff to be, inter alia, well-groomed, with normal motor behavior and appropriate eye contact. Id. Plaintiff's thought processes were coherent and goal-directed. Id. She demonstrated an anxious affect and neutral mood. Id. Plaintiff was oriented to person, place, and time, and her attention and concentration were intact. Id. Dr. Volpe noted plaintiff's recent and remote memory skills to be "[m]ildly impaired, due to emotional distress, secondary to anxiety and pain." Id. Plaintiff's cognitive functioning appeared to be below average; her insight was limited and judgment noted to be poor. (R. 382.) Dr. Volpe also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) in which she opined that plaintiff was moderately limited in her ability to make judgments on simple work-related decisions; understand and remember complex instructions; carry out complex instructions; interact appropriately with the public; and interact appropriately with co-workers. (R. 384-85.) She also found plaintiff to be markedly limited in her ability to make judgments on complex work-related decisions; interact appropriately with supervisors; and respond appropriately to usual work situations and to changes in a routine work setting. Id.

In a Medical Source Statement of Ability to Do Work-Related Activities (Mental), dated March 11, 2016, Dr. Rom opined that plaintiff was moderately limited in her ability to: understand and remember short, simple instructions; carry out short, simple instructions; and understand and remember detailed instructions; interact appropriately with the public; interact appropriately with supervisors; and interact appropriately with co-workers. (R. 402-03.) He also found plaintiff to be markedly limited in her ability to: carry out detailed instructions; make judgments on simple work-related decisions; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting. Id.

In a Medical Source Statement of Ability to Do Work-Related Activities (Physical), dated March 11, 2016, Dr. Rom opined, inter alia, that plaintiff can sit and stand/walk for a total of four hours in an eight-hour workday, and can occasionally lift/carry and push/pull less than ten pounds. (R. 405-06.) Dr. Rom also imposed various postural and manipulative limitations on plaintiff's abilities, and opined that plaintiff would need unscheduled breaks and walking breaks on an hourly basis. See R. 406.

ALJ presented a thorough analysis of the medical records which demonstrates that the evidence does not support the extent of the functional limitations claimed by plaintiff and assessed by Drs. Rom and Volpe. First, the ALJ considered the treatment records from December 2014 from Eagleville Hospital where plaintiff presented for treatment of heroin and benzodiazepine dependence along with a history of depression and anxiety. (R. 18.) The ALJ noted at discharge, that plaintiff had made "good progress" and was believed to be capable of maintaining her own well-being and sobriety through participation in lesser care. Id. The ALJ also considered the primary care records from 2015 which demonstrate that plaintiff reported a history of MS without treatment and chronic back pain. Id. The ALJ noted the generally normal findings on clinical examination and that plaintiff was referred to a neurologist for treatment of MS. Id.

The ALJ then considered the April 2015 neurology treatment records which again revealed generally normal findings "including no acute distress, preserved memory, normal attention span and concentration, appropriate mood and behavior, intact vision, normal motor tone and strength, normal gait, intact reflexes, and slightly decreased sensation on the right." (R. 18-19.) Plaintiff was diagnosed with relapsing remitting MS, prescribed medication, and referred for an MRI of the brain. (R. 19.) The ALJ considered the MRI results and treatment notes from a November follow-up appointment at which plaintiff "reported some excessive fatigue, depression, and pain in her right thigh with normal findings on physical examination." Id. The neurologist noted that plaintiff was tolerating treatment and doing reasonably well with regard to her MS. Id.

Additionally, the ALJ addressed the reports of the September 2015 psychological consultative examination conducted by Dr. Volpe and the September 2015 internal medicine

consultative examination conducted by Dr. Digamber.  Id.  The ALJ also considered Dr. Rom's

primary care treatment records from 2015 through 2017 which reflect that plaintiff presented for

regular visits and reported ongoing issues with chronic pain.  Id.  The ALJ stated:

> The notes from March 2016 show that the claimant stopped taking her medication
> and wanted to change neurologist.  The notes also showed that her MS had been
> in remission for as long as the doctor had been treating her.  In June 2016, the
> claimant presented with normal findings on clinical examination and requested
> methadone for her pain.  She was denied methadone but provided with Wellbutrin
> for situational depression.  In August 2016, she reported running out of
> Gabapentin but also admitted using her boyfriend's pain medication.  The notes
> also indicate that she reported unwillingness to attend behavioral health treatment
> for her anxiety and other symptoms.  It was noted that her MS was stable, though
> she was due for additional follow up.  During her 2017 visits, the claimant was
> regularly continued on her stable medication regimen.  (Exhibits 16F and 18F).

(R. 19-20.)[10]

The ALJ also took into account the 2016 treatment records of Temple Neurology,

which reflect normal findings upon examination.  (R. 20.)  Edward Gettings, D.O., reviewed an

MRI of plaintiff's brain and diagnosed plaintiff "with relapsing remitting MS without evidence

of progression.  He noted that her condition had been stable on disease modifying therapy despite

poor compliance and recommended continued treatment and regular monitoring."  Id.  A

December 2016 notation indicated that plaintiff "reported no symptoms consistent with clinical

relapse and Dr. Getting noted that she was tolerating her medication with minimal side effects,

though she was not completely compliant.  It was again noted that her condition was stable

without evidence of progression despite ongoing issues of medication compliance."  Id.

With respect to the recent mental health treatment records, the ALJ summarized

the June 2017 initial evaluation conducted by NHS Human Services, and a July 2017 psychiatric

---

[10]    The ALJ also summarized the March 2016 medical source statements completed by Dr.
Rom.  (R. 20.)

evaluation.  (R. 20-21.)  Subsequent treatment records document that plaintiff presented for

regular medication management sessions and that plaintiff reported some ongoing bouts of

depression despite taking medication.  (R. 21.)  The ALJ noted that plaintiff "displayed stable

and minimal findings on mental status examinations and it was regularly noted that her overall

condition remained stable."  Id.  A September 2017 treatment note indicated, inter alia, that

plaintiff presented for regular medication, individual and group therapy, and demonstrated

progress with treatment.  Id.  The most recent treatment note, dated October 2017, reflected that

plaintiff "reported feeling restless but also stated that her medication was helping with her mood.

She denied any side effects from medication and noted that her methadone maintenance also

helps to control her chronic pain issues."  Id.  Plaintiff's overall condition was noted to be "stable

with treatment."  Id.

Based on the foregoing, the ALJ determined that plaintiff's medically

determinable impairments could reasonably be expected to cause the alleged symptoms, but that

plaintiff's statements concerning the intensity, persistence, and limiting effects of these

symptoms are not entirely consistent with the medical evidence.  Id.  In support of this

conclusion, the ALJ then compared and contrasted plaintiff's claims with the evidence of record,

including specific citations to the record evidence.  See R. 22-23.  The ALJ explained that her

analysis was consistent with the Commissioner's regulations and rulings, and reasoned in great

detail as follows:

> In terms of her daily activities, she testified that she lives with her fiancé and five-
> year-old daughter and does not do much housework due to fatigue.  However, she
> also reported that she drives, uses public transportation, attends daily treatment,
> picks her daughter up from school, occasionally cooks, reads, knits, and spends
> time with her daughter including helping with her homework, coloring, and going
> to the park.  In her Function Report, she also indicated that she does not cook or
> clean, but does attend to her personal care, use public transportation, shop,
> manage her finances, read, watch television, spend time with others, go out to

dinner, and attend regular treatment. (Exhibit 4E). Finally, during the consultative examinations, she reported that she gets help with cooking, cleaning, and shopping but that she is able to attend to her personal care independently, drive, use public transportation, attend treatment, and spend time reading and watching television. (Exhibits 7F and 8F). Given these admissions regarding her ongoing high level of regular activities and interactions, despite any symptoms, a more restrictive functional assessment is not warranted at any time relevant to this decision.

In terms of her alleged symptoms, the claimant testified that she is unable to work due to shooting pain in her legs and fatigue that prevents her from standing or walking for long periods and horrible brain fog. She also reported a history of substance abuse and mental health symptoms related to depression and anxiety. However, during the consultative examinations, she displayed minimal positive findings on clinical examinations. Those findings included no acute distress, normal gait and station, full squat, no difficulty rising from a chair, normal skin and visual acuity, negative straight leg raises, no evidence of joint disformity, stable and non-tender joints, intact reflexes, no sensory deficits, intact strength, no muscle atrophy, and intact dexterity and grip strength. In terms of her mental presentation, she displayed cooperative presentation, adequate manner of relating, normal motor behavior, appropriate eye contact, adequate speech, cohere[nt] and goal directed thought processes, anxious affect, neutral mood, full orientation, limited insight, poor judgment, mildly impaired memory skills, and intact attention and concentration. (Exhibits 7F and 8F). These findings, considered in conjunction with the claimant's ongoing high level of regular activities and interactions, as discussed in detail above, indicate that while she may continue to experience some physical and mental symptoms, those symptoms have not consistently risen to the level of severity required to justify a finding of disability at any time relevant to this decision.

In terms of her treatment and medication, the records indicate that the claimant receives daily methadone maintenance related to her history of substance abuse. She also reported that she attends regular therapy sessions and takes medication to treat her physical and mental symptoms. She stated that the medication helps with her physical issues and depression with no negative side effects. The mental health treatment records also indicate that she reported some improvement in her mood and other symptoms with medication with no negative side effects. She reported that her methadone maintenance also helps with her pain issues and her treating nurse practitioner noted that her overall condition was stable. (Exhibit 23F). The primary care and neurology records also generally indicate that her conditions, including her MS, anxiety, and depression were stable and doing well with no indication of progression of her MS through regular medication and care despite some repeated issues of compliance with her MS medication. (Exhibits 6F, 14F, 16F, and 18F). The most recent primary care records also indicate that she presented with normal clinical findings and reported no active symptoms. (Exhibit 22F). Overall, the records indicate that the claimant has achieved some

> level of improvement and stability in her physical and mental symptoms with no progression of her MS through routine and conservative treatment including medication, therapy, and methadone maintenance.

Id. Thus, the ALJ clearly demonstrated that, although the medical records document plaintiff's treatment history, they do not support plaintiff's claims of functional limitations.

The ALJ then addressed the opinion evidence and expressly discussed the opinions of Drs. Volpe, Digamber, Rom, and Urbanowicz. (R. 23.) With respect to the opinion of Dr. Volpe, the ALJ indicated that the opinion was afforded partial weight. The ALJ reasoned that while it "was the result of an in person interview and examination . . . the marked limitations assessed seem to rely largely on the claimant's subjective complaints rather than the generally normal findings noted during the clinical examination." Id. The ALJ further reasoned that Dr. Volpe's opinion was inconsistent with "the treatment records documenting generally minimal symptom complaints, generally normal findings on clinical examinations, and noted symptoms improvement with treatment." See id.

With respect to the opinions of Dr. Rom, the ALJ similarly reasoned that the opinions were afforded partial weight because they were not supported by the record. The ALJ stated:

> Partial weight is given to the assessments from Dr. Rom, at Exhibits 9F and 10F, as he is the claimant's treating primary care physician. However, he is not her treating psychiatrist or neurologist. In addition, the physical limitations that he assessed are inconsistent with the contemporaneous treatment records documenting generally normal clinical findings and minimal symptom complaints. He also relied at least in part on her lack of work history in assessing her ability to work; however, this is inappropriate for a medical assessment and should not be considered in determining her physical and mental abilities.

(R. 23.) [11]

---

[11] Indeed, Dr. Rom's proffered explanation for the mental functional limitations is "[history of] MS and little work history." See R. 403. Similarly, in response to a question asking Dr. Rom

Contrary to plaintiff's assertions, the ALJ's comprehensive written decision explains how the opinions of Drs. Volpe and Rom do not find support in the record. That is, the ALJ's written decision sets forth in great detail treatment records that document generally minimal symptom complaints, generally normal findings on clinical examinations, and symptom improvement with treatment. See R. 17-24. The decision demonstrates that the ALJ considered plaintiff's testimony at the administrative hearing, the medical record evidence, and the opinion evidence. Id. In addition, the ALJ compared and contrasted plaintiff's claims regarding the intensity, persistence and limiting effects of her symptoms in light of the record evidence and opinion evidence. (R. 21-23.) Ultimately, the ALJ attributed "partial weight" to the opinions of Drs. Volpe and Rom because they were not supported by the evidence of record, and attributed "great weight" to the opinions of the internal medicine consultative examiner and the State agency medical reviewer. See R. 23. The ALJ's thorough written decision demonstrates that the ALJ acted in accordance with the precepts of the Commissioner's regulations and Third Circuit case law when she explained her reasons for weighing the evidence in the manner she did.[12]

---

to describe the objective findings, clinical observations, and symptomology supporting his physical functional limitations, Dr. Rom answered, "patient has not worked for any extended period of time for years." See R. 406.

[12]     The ALJ also attributed partial weight to Dr. Rom's statement that plaintiff was disabled for one year due to MS. (R. 23.) The ALJ acknowledged that Dr. Rom is a treating source, but also explained that the statement "is not given great or significant weight as it represents only a broad statement with no explanation or supporting clinical evidence." Id. The court notes that the Commissioner's regulations provide that "a statement by a medical source that you are disabled or unable to work does not mean that we will determine that you are disabled." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). "[A] statement by a plaintiff's treating physician supporting an assertion that [he] is 'disabled' or 'unable to work' is not dispositive of the issue." Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) (citing Wright v. Sullivan, 900 F.2d 675, 683 (3d Cir. 1990)). "The law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Brown, 649 F.3d at 196 n.2. See also Breen v. Comm'r of Soc. Sec., 504 F. App'x 96, 99 n.3 (3d Cir. 2012) (not precedential) ("While treating medical source opinions may be afforded controlling weight on issues such as the nature and

The court also is not persuaded by plaintiff's argument that the ALJ improperly relied upon lay opinion in formulating the RFC. The Commissioner's regulations in effect at the time of the ALJ's decision clearly state that the responsibility for assessing a claimant's RFC lies with the ALJ. See 20 C.F.R. §§ 404.1546(c), 416.946(c) ("If your case is at the administrative law judge hearing level . . . , the administrative law judge . . . is responsible for assessing your residual functional capacity."). Subsequent opinions in this Circuit reiterate that "[t]he ALJ -- not treating or examining physicians or State agency consultants -- must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)). See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006) (not precedential) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC. Surveying the medical evidence to craft an RFC is part of the ALJ's duties."); Mays v. Barnhart, 78 F. App'x 808, 813 (3d Cir. 2003) (not precedential) ("[T]he ALJ is responsible for making a residual functional capacity determination based on the medical evidence, and he is not required to seek a separate expert medical opinion.") (citing 20 C.F.R. §§ 404.1527(e), 404.1546(c)). See also Lewis v. Berryhill, 2018 WL 3447177, at *4-5 (E.D. Pa. July 17, 2018) ("The ALJ was 'not bound to accept the opinion or theory of any medical expert,' but rather could 'weigh the medical evidence and draw his own inferences.'") (citing Kertesz v. Crescent Hills Coal Co., 788

---

severity of a claimant's impairment, 20 C.F.R. § 404.1527(c)(2), opinions on issues reserved to the Commissioner – i.e., a claimant's residual functional capacity – are not entitled to 'any special significance' regardless of the source of the opinion, id. (d)(2)-(3).").

Additionally, the court notes that Dr. Rom's opinions consisted of check-the-box and fill-in-the-blank forms and offer weak evidence in support of plaintiff's claims. See R. 402-06; see also Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("[F]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."); Byrd v. Berryhill, 2018 WL 2009535, at *3 (E.D. Pa. Apr. 27, 2018) (same).

F.2d 158, 163 (3d Cir. 1986); Chandler, 667 F.3d at 361-62); Cleinow v. Berryhill, 311 F. Supp. 3d 683, 686 (E.D. Pa. 2018) (holding that an "ALJ is not restricted to adopting the conclusions of a medical opinion in making an RFC determination" where "the ALJ properly considered Plaintiff's medical records as a whole in determining Plaintiff's RFC, and was not required to rely on a specific medical opinion"); Northington v. Berryhill, 2018 WL 2159923, at *1 n.l (E.D. Pa. May 10, 2018) (finding that the ALJ did not err by "draw[ing] a medical conclusion in lieu of a doctor; she simply used medical evidence to craft an RFC").

In any event, the opinions of Dr. Digamber and Dr. Urbanowicz support the ALJ's RFC determination. Although Dr. Urbanowicz did not examine plaintiff, the ALJ was entitled to rely upon this opinion in formulating the RFC. "State agent opinions merit significant consideration." Chandler, 667 F.3d at 361. See SSR 96-6p, 1996 WL 374180, at *2 (S.S.A. July 2, 1996) ("Because State agency medical and psychological consultants . . . are experts in the Social Security disability programs, . . . [Social Security regulations require ALJs] . . . to consider their findings of fact about the nature and severity of an individual's impairment(s) . . . . [ALJs] are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."); see also Brunson, 704 F. App'x at 60 ("Contrary to [plaintiff's] assertions, Dr. Wander - as a state agency medical consultant - was per se qualified to issue a medical opinion for the ALJ's consideration."). Indeed, "an ALJ can choose to accept the findings of evaluating, non-examining state agency physicians over the opinions of treating physicians where the treating physicians' opinions were 'conclusory and unsupported by the medical evidence' and contradictory to other medical evidence of record." Myers v. Barnhart, 57 F. App'x 990, 996 (3d Cir. 2003) (not precedential) (citing Jones v. Sullivan, 954 F.2d 125,

129 (3d Cir. 1991)). Moreover, the opinion of Dr. Digamber, the internal medicine consultative examiner, who determined that plaintiff is capable of medium work, also lends support to the ALJ's RFC determination with respect to plaintiff's physical impairments. Thus, the ALJ's analysis clearly demonstrates that her RFC finding was not based on impermissible speculation, but rather, her assessment of the medical records, including all of the opinion evidence. The ALJ did not err in weighing the opinions in the manner she did. See Armbruster v. Colvin, 2016 WL 5930913, at *7 (E.D. Pa. Oct. 12, 2016) (finding no error in the ALJ's attribution of various amounts of weight to the opinion evidence). See also Lewis, 2018 WL 3447177, at *4-5 (same).[13]

The court is mindful that this court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994). This court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. Monsour Med. Ctr., 806 F.2d at 1190-91. See Chandler, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); Burns, 312 F.3d at 118 ("We also have made clear that we are not permitted to weigh the evidence or substitute our own conclusions for that of the fact-finder.").

Plaintiff essentially seeks to have this court re-weigh the evidence and reach a different conclusion. However, a reviewing court may not set the Commissioner's decision aside

---

[13]     To the extent plaintiff asserts the ALJ erred by failing to recontact plaintiff's medical sources, the court is likewise not persuaded. The regulations provide that an ALJ may recontact a medical source for clarification, if such clarification is needed to make the disability determination. See 20 C.F.R. §§ 404.1520b(b), 416.920b(b). There is nothing in the record here to indicate the ALJ was unable to make the disability determination based on the evidence in the record. See id.

if it is supported by substantial evidence, even if the court would have decided the factual inquiry differently.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  In reaching her determination concerning the weight to give the opinions of Drs. Rom and Volpe, the ALJ acted in accordance with the Commissioner's regulations and Third Circuit case law.  Substantial evidence supports the ALJ's analysis of the opinion evidence.  See Biestek, 139 S. Ct. at 1154 (Substantial evidence "means -- and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Remand is not warranted.

## V.    CONCLUSION

After a careful and thorough review of all of the evidence in the record, and for the reasons set forth above, this court finds that the ALJ's findings are supported by substantial evidence.  Accordingly, plaintiff's Request for Review will be denied.

An appropriate Order accompanies this opinion.


BY THE COURT:


__/s/ Thomas J. Rueter_____
THOMAS J. RUETER
United States Magistrate Judge